DECISION
This dispute arises from contractual obligations created by a purchase and sale instrument for approximately 606 acres of land off of Middle Road in Portsmouth, Rhode Island. Plaintiff, FLJ Acquisitions, Inc. (FLJ), now requests that this Court grant its application for a preliminary injunction enjoining the defendants from foreclosing on the mortgage, and while litigation is pending, compelling the Estate to deliver a partial release of the mortgage to FLJ in exchange for the payment of $17,000 for each lot on the property sold by ELI.
The purchase and sale agreement spawning this dispute was originally entered into in April of 1994 by the defendants' and plaintiffs' predecessor-in-interest, Federal Investment Corp., Inc Section 2 of that agreement defining the purchase price included a provision that the price would be increased by $5,000 for each approved and buildable lot over 40 lots. Literally, the price increase does not "kick in" unless the number of lots exceeds 40 Section 3 of the agreement requires that the purchase price be paid at the closing.
Plaintiff actually acquired the property from the defendants by virtue of a November 20, 1995, Transfer Agreement with accompanying note and mortgage. Prior to the transfer, the parties had executed two amendments. The first amount, executed around May of 1995 did not reference any kicker clause.
While the Second Amendment (October, 1995) modified the amendment of installment payments due the Estate upon the sale of each lot, it did not alter the purchase price. Nor did it contemplate the formulation of kicker adjustments after closing.
On November 8, 1995 a "Third Amendment of Purchase and Sales Agreement" (Ex. F) was apparently executed between the co-executors and Sores Farm, LLC. It provides, in part, that the parties agree that the terms and provisions of "this agreement" shall survive the closing and settlement of "this" transaction. This is the first suggestion that kicker adjustments could be triggered by and calculated according to post-closing events.
The Court heard the testimony of several witnesses including the attorneys who bad represented the litigants in the underlying negotiations.
The parcel of real estate, which is the subject of the purchase and sale agreement in controversy, is comprised of 60.6 acres off of Middle Road in Portsmouth. Mary Soares, who passed away in July of 1990, previously owned it. Mrs. Soares' children, Laura Dietle and Francis Soares, who were appointed as co — executors of her estate, are the named defendants in this case
Mr. Sores, presently residing in Tuscan, Arizona, testified that approximately eight months after his mother's death, he attempted to sell the property with the professional assistance of Brace Allen Remax Realtors. Negotiations commenced with potential buyers and resulted in the formation of the agreements in controversy.
Mr. Soares testified that his impression of the kicker clause is that it entitles the estate to $5,000 per excess lot "forever", "no matter how long it takes the developer to get approval, even if it takes twenty years."
Mr. Soares' real estate broker, Bruce D. Allen testified that he first listed the property for the estate in January 1994. Mr. Allen met Mr. Lohrum in 1995 when ELF expressed an interest in having Mr. Lohrum join the investment as a partner. In March of 1997, Mr. Allen began to work with Mr. Lohrum to sell the lots. The month before the note became due, Mr. Allen wrote a letter, on Mr. Lohrum's behalf, to the Soares family with a proposition. The proposal consisted of increasing the payoff release to $25,000 and included the maximum number of 69 lots in the payoff.
Attorney Stephen P. DeLuca, who represented ELI in the transaction, testified he believed that the purchase price was fixed as of the closing date. Part of that price included $5,000 per lot in excess of 40 determined to be approved and buildable. Consistent with that position, attorney DeLuca wrote to attorney Fater on November 9, 1998, after the closing, and explained that there were not in excess of 40 lots and, thus, no additional sums were owed. (Exh."O"). Attorney Fater did not relent, causing attorney DeLuca to reiterate his position, and to request, at minimum, a partial release for his client. In essence, attorney Fater theorized that the kicker clause went on ad infinitum until all developable lots could be identified. Attorney DeLuca explained that it was impossible to have "surviving kickers" as they constituted an indefinite obligation. This would make it impossible to obtain financing and execute transfers.
Mr. Frederick C. Lohrumn, principal of plaintiff FLJ, testified that he first became interested in the property while working as Project Manager for FIC. When the latter was sold and Mr. Lohrum was informed that he no longer had a job, he decided to pursue the project on his own, To that and, he met with Lisa and Frank Soares, and Bruce Allen at a coffee shop to discuss his plan. Mr. Lohrum also attended planning board meetings while seeking his permits and was ultimately approved by the board to develop the project in phases.
From the spring of 1997 to the end of 1997 Mr. Lohrum did not even talk to Mr. Soares. Mr. Soares, unfortunately, was incapacitated during this period due to a heart attack. Specifically, Mr. Lohrum "never talked to Soares regarding a kicker clause." The witness was aware of the "kicker clause", but felt it was "ambiguous". "not crystal clear" and "went away" when consent to approvals was waived. Mr. Lohrum testified that he signed Exhibit "A" because he did not want, to "blow the deal" and was confident that any problems could be worked out in the future. His prime motivation was to close, not clarify, the deal
The plaintiff argues that the Kicker Adjustment must be interpreted and applied according to the provisions of the Purchase and Sale Agreement (as amended by the First and Second Amendments), as well as the Note, Mortgage and Transfer Agreement. With respect to the Assumption and Modification Agreement, FLJ asserts that the pertinent provision, Paragraph 2.2(b), is unenforceable because it does not represent a mutuality of intent. Moreover, according to plaintiff, it is the product of duress and coercion. Alternatively, plaintiff argues that if the provision is enforceable, it is vague, ambiguous and unclear.
The defendants have acknowledged that the October 30, 1997 Assumption and Modification Agreement is ambiguous because it "fails to provide a date for determining the total number of lots approved and buildable and for calculating the additional sums, if any, due the Estate." Nonetheless, defendants contend that the intention was to have the "additional sums" owed the Estate an outstanding debt on the property subsequent to the date of maturity on the original note. Is the Estate to remain open ad infinitum in Probate Court to insure proper notice and accounting by the executors?
The defendants also invite the Court to declare that the conduct of the parties supports a finding of a joint venture for mutual profit. The Court neither heard nor saw any evidence, which would allow such a conclusion, and thus declines the invitation.
If the Court were to find that a fixed sum was due on November 8, 1998, defendants would characterize that decision as "unjust enrichment" to the plaintiff because of its "own delay in the development and sale of the lots." To the contrary, the record demonstrates that plaintiff was exceedingly diligent and that Mr. Lohrum did everything in his power to keep the project alive.
The Court is fully satisfied that the credible evidence warrants the granting of the equitable relief plaintiff seeks. The only workable, practicable, and reasonable construction of the pertinent document, in conjunction with the in-court testimony, is that a sum certain had to quantifiable as of the maturity date. Since less than 40 lots were "approved and buildable" as of that date, plaintiff has no obligation to pay additional sums. Clearly, the Estate is obligated to deliver to plaintiff partial releases for the $17,000 payments per lot from the plaintiff.
To hold otherwise would work a severe injustice upon the plaintiff Meanwhile, the rights of the defendants would not be comprised in any way.
Finally, under no interpretation of the credible evidence do the defendants have any lawful right to maintain foreclosure proceedings. Plaintiff's request to enjoin and same to obtain partial releases is hereby granted.